
FILED
2012 Jun-13 AM 09:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| NICHOLE COLLETTE POLLARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 11-G-2827-NE |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

## **MEMORANDUM OPINION**

The plaintiff, Nichole Collette Pollard, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying her application for Social Security Disability benefits. Plaintiff timely pursued and exhausted her administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. §405(g).

## **STANDARD OF REVIEW**

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached

is reasonable and supported by substantial evidence." <u>Bloodsworth</u>, at 1239 (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Bloodsworth</u>, at 1239..

## STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled.  The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I).  For the purposes of establishing entitlement to disability benefits, physical or mental impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R.§ 404.1520(a)-(f).  The Commissioner must determine in sequence:

(1)     whether the claimant is currently employed;

(2)     whether she has a severe impairment;

(3)     whether her impairment meets or equals one listed by the Secretary;

(4)     whether the claimant can perform her past work; and

>   (5)   whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir.1993); accord McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job." Pope at 477; accord Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner further bears the burden of showing that such work exists in the national economy in significant numbers. Id.

In the instant case, ALJ Ann G. Paschall determined the plaintiff met the first two tests, but concluded that while she has an impairment or impairments considered "severe," her impairments do not meet or equal in severity any impairment set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 12, 14]. The ALJ found the plaintiff unable to perform her past relevant work. Once it is determined that the plaintiff cannot return to her prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do." Foote, at 1559. Furthermore, when, as is the case here, a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical-Vocational Guidelines (the grids). Foote, at 1558-59. The presence of a non-exertional impairment, pain, also prevents exclusive reliance on the grids. Foote, at 1559. In such cases "the [Commissioner] must seek expert vocational testimony." Foote, at 1559.

## THE STANDARD WHEN THE CLAIMANT TESTIFIES SHE SUFFERS FROM DISABLING PAIN

In this circuit, "a three part 'pain standard' [is applied] when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms." Foote, at 1560.

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

Foote, at 1560 (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). In this circuit medical evidence of pain itself, or of its intensity, is not required.

> While both the regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, <u>neither requires objective proof of the pain itself</u>. Thus under both the regulations and the first (objectively identifiable condition) and third (reasonably expected to cause pain alleged) parts of the Hand standard <u>a claimant who can show that his condition could reasonably be expected to give rise to the pain he alleges has established a claim of disability and is not required to produce additional, objective proof of the pain itself</u>. See 20 CFR §§ 404.1529 and 416.929; Hale at 1011.

Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1215 (11th Cir. 1991) (parenthetical information omitted) (emphasis added). Furthermore, it must be kept in mind that "[a] claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." Foote at 1561. Therefore, if a claimant testifies to disabling pain and satisfies the three part pain standard, she must be found disabled unless that testimony is properly discredited.

When the Commissioner fails to credit a claimant's pain testimony, he must articulate reasons for that decision.

> It is established in this circuit that if the Secretary fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true. Implicit in this rule is the requirement that such articulation of reasons by the Secretary be supported by substantial evidence.

Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987). Therefore, if the ALJ either fails to articulate reasons for refusing to credit the plaintiff's pain testimony, or if his reasons are not supported by substantial evidence, the pain testimony of the plaintiff must be accepted as true.

## THE IMPACT OF A VOCATIONAL EXPERT'S TESTIMONY

It is common for a vocational expert ("VE") to testify at a claimant's hearing before an ALJ, and in many cases such testimony is required. The VE is typically asked whether the claimant can perform his past relevant work or other jobs that exist in significant numbers within the national economy based upon hypothetical questions about the claimant's abilities in spite of his impairments. "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999).

If the claimant is unable to perform his prior relevant work the burden shifts to the Commissioner to establish that he can perform other work. In such cases, if the vocational expert testimony upon which the ALJ relies is based upon a hypothetical

question that does not take into account all of the claimant's impairments, the Commissioner has not met that burden, and the action should be reversed with instructions that the plaintiff be awarded the benefits claimed. This is so even if no other hypothetical question is posed to the VE. See Gamer v. Secretary of Health and Human Services, 815 F.2d 1275, 1280 (9th Cir. 1987)(noting that when the burden is on the Commissioner to show the claimant can do other work, the claimant is not obligated to pose hypothetical questions in order to prevail). However, it is desirable for the VE to be asked whether the claimant can perform any jobs if his subjective testimony or the testimony of his doctors is credited. Such a hypothetical question would allow disability claims to be expedited in cases in which the ALJ's refusal to credit that testimony is found not to be supported by substantial evidence.

In Varney v. Secretary of Health and Human Services, 859 F.2d 1396 (9th Cir. 1987), the Ninth Circuit adopted the Eleventh Circuit rule which holds that if the articulated reasons for rejecting the plaintiff's pain testimony are not supported by substantial evidence, that testimony is accepted as true as a matter of law. Id at 1401. The court noted that "[a]mong the most persuasive arguments supporting the rule is the need to expedite disability claims." Id. If the VE is asked whether the claimant could perform other jobs if his testimony of pain or other subjective symptoms is accepted as true, the case might be in a posture that would avoid the necessity of a remand. As Varney recognized, if the VE testifies the claimant can perform no jobs if his pain

testimony is accepted as true, the only relevant issue would be whether that testimony was properly discredited.  Id.  This also holds true for the opinions of treating physicians.

## DISCUSSION

The plaintiff originally claimed disability beginning January 15, 2008, but on August 24, 2010, she amended her alleged onset date to December 1, 2008, "to conform to the evidence of record and the medical opinions of record. . . ." [R.181].  ALJ Paschall found that the plaintiff has the following severe impairments:  "Scheuermann's kyphosis; degenerative disc disease, thoracic and lumbar; depression; anxiety; and personality disorder. . . ." [R. 12].  Scheuermann's kyphosis is named after Danish surgeon Holger Werfel Scheuermann (1877-1960), and is "a disease of the growth or ossification centers in children which begins as a degeneration or necrosis followed by regeneration or recalcification."  Dorland's Illustrated Medical Dictionary 1200 (28th Ed. 1994). Kyphosis is an "abnormally increased convexity in the curvature of the thoracic spine as viewed from the side; hunchback."  Id. at 890.

The medical evidence of record reveals that the plaintiff was treated at Huntsville Hospital on September 14, 2006, for lower back pain she described as "like something cracking" and rated at a 10 out of 10 in intensity. [R. 307].  The clinical impression was acute myofascial lumbar strain. [R. 306].  On May 19, 2008, the plaintiff was examined by Prem K. Gulati, M.D., at the behest of the Commissioner.  Dr. Gulati noted the plaintiff's history:

> This is a 41-year-old white female who complains of having low back pain since 2007. She is not sure but states that around November 2007 she hurt her back when she was run over by a car. She got up and walked home. She had no medical treatment and did not go to the emergency room. She continues to have pain off and on since that time. She takes no medication. The pain is intermittent, sharp which radiates to the left leg and left ankle. She has no numbness or tingling in her toes. The pain is better with laying [sic] down and worse with standing on her foot. She has no urinary incontinence.

[R. 332]. On examination, Dr. Gulati found no spasms, deformity or tenderness, and range of motion of the dorsolumbar spine revealed no abnormalities. [R. 333]. X-rays of the lumbosacral spine showed that the joint spaces were well maintained, but with mild scoliosis to the right. Id. Dr. Gulati concluded, "It is my impression that this lady can do sitting, standing, lifting and carrying jobs without any difficulty." [R. 334].

On December 10, 2008, the plaintiff underwent a consultative psychological evaluation by Jon G. Rogers, Ph.D. After a mental status examination, Dr. Rogers diagnosed:

> AXIS   I     Depressive Disorder NOS DSM IV 311.
>               Anxiety Disorder NOS with PTSD Features DSM IV 300.00.
>               Alcohol Dependence DSM IV 303.90 (in remission by self-report).
>
> AXIS  II    Personality Disorder NOS DSM IV 301.9.
>
> AXIS III   Stomachaches, dizziness, and daily pain (5/10) in her back.
>
> AXIS IV    Psychosocial stress stemming from her difficulties in relationship to her occupational problems.
>
> AXIS   V    Global Assessment of Functioning = 51.

[R. 490]. He assessed her ability to perform daily activities:

> Ms. Pollard is able to function independently. The quality of her daily activities is below average. The medical evidence or record provided by DDS was reviewed and those findings were considered in the overall assessment of the patient. She presented on this testing occasion stating that she cannot work "because I can't concentrate or stand on my feet for long. I'm not able to concentrate and do the job. I have bad pain in my lower back." She denied any recent substance abuse. She reported depression and anxiety are factors in her employability. "I can't breathe and feel faint." <u>Physical, as opposed to psychiatric, symptoms appear to be the major obstacle to employment</u>.

[R. 489].(emphasis added)

Two days later, the Commissioner sent her to another consultative physical examination by John H. Lary, Jr., M.D. On examination, Dr. Lary reported:

> <u>BACK</u>: No kyphosis is present. Back musculature appears normal to inspection and palpation. Is able to flex upper body at waist only 45 degrees and hyperextend only 10 degrees. Straight leg raising test is normal at 60 degrees bilaterally.

[R. 495]. His diagnoses included chronic back pain complaint, chronic knee pain complaint, with normal physical findings, migraine, by medical history, and psychiatric complaints. [R. 496]. In Dr. Lary's opinion, the plaintiff's ability to sit, stand, walk, lift, carry, bend, squat, reach, see with corrected lenses, hear, speak, understand, and manipulate small objects is unimpaired. [R. 497].

The ALJ found that:

> With regard to the claimant's back impairments, I have limited her to the performance of sedentary work, requiring her to lift or carry no more than 10 pounds, with a sit/stand option. In doing so, I note that the claimant testified at the hearing that she could routinely lift and carry 10 pounds. I have included a sit/stand option in light of the claimant's allegation that she needs to change positions to relieve pain. The record establishes that the claimant is capable of such work.

[R. 17]. In making this finding, the ALJ gave great weight to the opinion of Dr. Lary:

> He performed a physical examination of the claimant and opined that her ability to sit, stand, walk, lift, carry, bend, squat, reach, see (with corrective lenses), hear, speak, understand and manipulate small objects was unimpaired. (Exhibit 14F). His opinion is consistent with results from his examination, as well as the results from Dr. Gulati's examination.
>
> I also give great weight to Dr. Rogers, who performed a mental consultative examination of the claimant and determined that she was able to function independently and that psychiatric symptoms did not appear to be a major obstacle to employment. (Exhibit 13F). His report is consistent with the objective medical evidence of record and with the claimant's lack of mental health treatment.

Id.

Despite the ALJ giving Drs. Lary and Gulati great weight, neither examiner had the benefit of MRI testing. On May 6, 2009, the plaintiff underwent an MRI of her thoracic spine, which showed irregularities of the vertebral end plates at T7-8, T10-11, and T11-12 levels, suggestive os Scheuermann's kyphosis. [R. 533]. The MRI also revealed Schmorl's nodes[1] on either side of the vertebral end plates at T11-12. Id. Similarly, an MRI of the plaintiff's lumbar spine taken that same day showed:

> There are irregularities on either side of the vertebral end plates at T11-12, T12-L1, and at the L2-3 and L4-5 levels, suggesting Scheuermann's kyphosis. There is degenerative disc disease at the L3-4 level with circumferential disc bulging and facet arthropathy. There is no central canal stenosis or neural foraminal narrowing.
>
> There is degenerative disc disease at the L4-5 level, with circumferential disc bulging and facet arthropathy. There is superimposed broad based

---

[1] A Schmorl's nodule is "seen in radiographs of the spine, due to prolapse of a nucleus pulposus into an adjoining vertebra." Dorland's Illustrated Medical Dictionary 1144 (28th Ed. 1994).

>central disc protrusion.  There is no central canal stenosis or neural
>foraminal narrowing.  There is a focus of abnormal signal in the L3
>vertebral body, consistent with benign hemangioma.

[R. 532].

The plaintiff introduced pages 2413 to 2415 of <u>The Merck Manual</u>, 17th Ed., into the record for further information regarding Scheuermann's Disease:

>*A relatively common condition in which backache and kyphosis are associated with localized changes in the vertebral bodies.*
>
>The disorder presents in adolescence, more commonly in boys.  It probably represents a group of conditions sharing similar features, but the etiology and pathogenesis are uncertain.  Osteochondritis of the upper and lower cartilaginous vertebral end plates has been implicated, but trauma sometimes is causative.  Some affected persons show a familial tendency.
>
>A round-shouldered posture and persistent low-grade backache are the usual presenting features.  Some affected persons have a marfanoid habitus, with disproportionality between trunk and limb length.  Mild cases often are recognized during routine screening in school for spinal deformity.  The major clinical finding is an increase of the normal thoracic kyphosis, which may be diffuse or localized.  The course is long (very variable–often several years) but mild; trivial spinal malalignment often persists after the disorder has become quiescent.
>
>Lateral spinal x-rays show anterior wedging of the vertebral bodies, usually in the lower thoracic and upper lumbar region.  The end plates become irregular and sclerotic in later stages.  Spinal malalignment is predominately kyphotic, but an element of scoliosis sometimes is present. In atypical cases, a generalized skeletal dysplasia and spinal TB must be excluded. Mild, nonprogressive cases can be treated by reducing weight-bearing stress and by avoiding strenuous activity.  Occasionally, when the kyphosis is more severe, a spinal brace or rest and recumbency on a rigid bed are indicated.  Surgical stabilization and correction of malalignment are rarely required for progressive cases.

[R. 623].

Drs. Lary and Gulati did not have the benefit of these MRIs during their examinations. To assign their opinions controlling weight while at the same time rejecting the credibility of the plaintiff's pain testimony was error. At the hearing, the plaintiff testified that her back pain makes it impossible to get comfortable. [R. 64]. She described the pain as a 10 out of 10 when not taking pain medications; with the medications the pain will decrease to a seven out of 10. Id. The plaintiff testified that she does not have health insurance,[2] and that her friend had been helping her to pay for some prescription pain medication, but he is not able to do it any longer. [R. 59-60]. She testified that she tries massages, a heating pad, and long showers in an effort to reduce her pain. [R. 65]. The plaintiff testified that she has to lie down flat in her bed for three hours a day to try to relieve the pain in her back. Id. She said that her back becomes stiff to where she cannot move, and has to spend about four to five days a month in bed. [R. 66]. She testified that extreme fatigue causes her to take naps of up to two hours during the day, everyday. [R. 74].

In her decision, the ALJ found:

> In activities of daily living, the claimant has moderate restrictions. In her Function Report, the claimant reported no problems with dressing, shaving, feeding herself, or using the toilet. However, she did report that bathing causes her to have pain in her head and lower back and that taking care of her hair causes her to have pain in her head as well. She reported that she is still able to cook meals, but she cooks light meals and less often than she did prior to her amended onset date. She reported that she is able to do

---

[2] Poverty excuses noncompliance with prescribed treatment. Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988).

12

activities for about 30 minutes, at which time she has to rest/change positions.

[R. 14-15].

The activities of daily living recited by the ALJ do not support a finding that the plaintiff's pain testimony is not true. The ability to perform the limited activities noted by the ALJ does not rule out the presence of disabling pain. The ability to watch television, do occasional shopping, or perform other sporadic activities does not mean the plaintiff is not disabled. In this circuit it has been recognized that "participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability. Lewis v. Callahan, 125 F.3d 1346, 1441 (11th Cir. 1997). As has been noted:

> [S]tatutory disability does not mean that a claimant must be a quadriplegic or an amputee. Similarly, shopping for the necessities of life is not a negation of disability and even two sporadic occurrences such as hunting might indicate merely that the claimant was partially functional on two days. <u>Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity</u>. . . . It is well established that sporadic or transitory activity does not disprove disability.

Smith v. Califano, 637 F.2d 968, 971-72 (3rd Cir. 1981)(emphasis added). It is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform minor household chores or drive short distances. In Easter v. Bowen, the court observed as follows:

> Moreover, an applicant need not be completely bedridden or unable to perform any household chores to be considered disabled. See Yawitz v. Weinberger, 498 F.2d 956, 960 (8th Cir.1974). What counts is the ability to perform as required on a daily basis in the "sometimes competitive and

  stressful" environment of the working world.  <u>Douglas v. Bowen</u>, 836 F.2d
  392, 396 (8th Cir.1987) (quoting <u>McCoy v. Schweiker</u>, 683 F.2d 1138,
  1147 (8th Cir.1982) (en banc)).

867 F.2d 1128, 1130 (8th Cir. 1989).  The <u>Easter</u> court further noted that "[e]mployers are concerned with substantial capacity, psychological stability, and steady attendance . . . ." 867 F.2d at 1130 (quoting <u>Rhines v. Harris</u>, 634 F.2d 1076, 1079 (8th Cir.1980)).

  With this standard in mind, it is clear that the ALJ's articulated reasons for rejecting the plaintiff's pain testimony are not supported by substantial evidence.  Therefore, the ALJ failed to satisfy the requirements of <u>Hale</u>.  The conclusion of that court is equally appropriate in the instant case.  "[T]he Secretary has articulated reasons for refusing to credit the claimant's pain testimony, but none of these reasons is supported by substantial evidence.  It follows, therefore, that claimant's pain testimony has been accepted as true."  <u>Hale</u>, at 1012.

  At the hearing, the vocational expert, after identifying several jobs that a hypothetical individual could perform with a residual functional capacity as determined by the ALJ, was asked:

  Q: And if this individual is further limited by chronic pain and fatigue
    from depression such that he or she could not work eight hours a
    day, five days a week, would these jobs [you identified] or any others
    be available?

  A: No, your honor.

[R. 82].  Then, the plaintiff's attorney questioned the VE:

  Q: If a person was required – as a result of pain or fatigue or depression
    causing them to withdraw from the work station and have to lay [sic]

> down or recline for a period of one to two hours for three to four days a week, with the actual laying [sic] down time being 30 minutes to an hour each time, would there be any work in the regional or national economy that such a person would be able to perform?
>
> A: No, sir.

Id. Taking the plaintiff's testimony as true, the VE's testimony establishes disability without a doubt.

## CONCLUSION

Therefore, the Commissioner failed to carry his burden at step five of showing the plaintiff could perform other work. Accordingly, the plaintiff is disabled within the meaning of the Social Security Act. An appropriate order remanding the action with instructions that the plaintiff be awarded the benefits claimed will be entered contemporaneously herewith.

DONE and ORDERED 13 June 2012.

_____
UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.